**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Raymond Denczak,** | ) | **CASE NO. 1:04 CV 2506** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Ford Motor Co.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendant.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 17).  This matter arises under the ADA.  For the following reasons, the motion is GRANTED.

<u>**Facts**</u>

Plaintiff, Raymond Denczak, filed this Complaint against defendant, Ford Motor Company (hereafter, defendant or Ford).  Plaintiff began his employment with Ford in 1972 at the Canton Forge facility as a laborer.  He transferred to the Walton Hills Stamping Plant in 1984 after the Canton facility closed.  Plaintiff worked in various assembly positions

1

until he became ill in 1995.  A medical condition required that plaintiff undergo three operations within a year to remove his colon and rectum.  Plaintiff was absent from work during this one year period.  (pltf. depo. 15-23).

In 1996, plaintiff returned to work with a letter of restriction from his doctor that plaintiff would require "frequent bathroom use."  When he returned to work, plaintiff was placed on the 275 assembly line which welded bolts into a pan.  Within his first week of returning to work, plaintiff was transferred to a single-point job where he worked by himself and which allowed him to take frequent bathroom breaks.  This transfer was precipitated by plaintiff's inability to wait for a replacement on the line when the need to go to the bathroom arose.  Plaintiff "walked off the line" when a replacement did not arrive within 8-10 minutes.  When he returned from the bathroom, his supervisor told him to go to the labor relations office.  On the way to the office, plaintiff encountered a Union representative who then spoke to plaintiff's supervisor.  Plaintiff was then immediately transferred to the single-point job.  (*Id.* 26-30).

Once assigned to the single-point job, plaintiff's supervisor, Dallas Holcomb, on one occasion commented that they should move the press into the bathroom so that plaintiff would be closer to the toilet. (*Id.* 30-31).

In 1996, plaintiff had gallbladder surgery and was off work for approximately five weeks. When he returned, plaintiff's restrictions, imposed by his physician, included: frequent bathroom use, work at his own pace and a 40 hour work week.   Plaintiff was placed on the 285 line working a two-man press.  Plaintiff's foreman, Nick Gliatta, complained that plaintiff left to go to the bathroom too often.  Plaintiff continued to work on the 285 line until 2003,

2

with the exception of various temporary single-point jobs and "cleaning once in a while." (*Id.* 33-37, 50).

Beginning in 1996, plaintiff sought a permanent cleaner 2 position where he would be responsible for cleaning bathrooms, offices and cafeterias.  The position is not governed strictly by plant seniority, but is designed for employees with restrictions.   Plaintiff received temporary transfers to the position over the years, but job preference was given to employees with injuries sustained at work.  In 2003, plaintiff won a bid position for a cleaner 3, a job awarded on the basis of seniority.  He was in that position for about one year with the exception of temporary assignments to the production department.  Plaintiff believed the cleaner 3 position accommodated his restrictions. In March 2004, plaintiff was "bumped off or reduced off" the cleaner 3 position and transferred to a single- point welding position on the 255D line in the 80 Department.  The job was a 40 hour per week position and plaintiff was able to take unlimited bathroom breaks. The position required plaintiff to weld 225 parts per hour.  Plaintiff produced around 75-95 parts per hour.  On April 20, 2004, Chuck Silvey, plaintiff's supervisor, issued to him a Disciplinary Action Report for not making enough parts and talking on the job.  Plaintiff was given an hour off for his conduct.  He filed a grievance. (*Id.* 38-44, 56-66, 99; Ex. 1).

Around this time, Silvey approached Cynthia Malloy of Labor Relations to inform her that plaintiff was producing only about 30% of his work.  Malloy asked defendant's medical staff, Dr. Rollins, to clarify whether 30% was acceptable for plaintiff's restriction.  Dr. Rollins told Malloy that plaintiff should be able to produce 100% (225 parts per hour) on the single-point job.  (Malloy depo. 23-25).  On April 22, 2004, Malloy instructed plaintiff to

report to Dr. Rollins.  Plaintiff told Rollins that he was unable to make the 225 part target and

that he could not perform any production job at the 100% level.   Rollins determined that

plaintiff could not perform any production job at the 100% level and, accordingly, issued

plaintiff a restriction of "no production work."  Plaintiff was then placed on No Work

Available because defendant did not have a job within this restriction.  (pltf. depo. 68; Amy

Adams depo. Ex. 3).

On April 12, 2004 (prior to his discipline and Rollins' determination), plaintiff

completed an application for retirement, effective June 1, 2004.  Plaintiff had decided to retire

on April 1, 2004.  (pltf. depo. 86 and Ex. 2).

Plaintiff thereafter filed this Complaint setting forth two claims.  Count One alleges

that plaintiff was disabled within the meaning of the ADA and defendant failed to reasonably

accommodate plaintiff beginning on March 22, 2004.  Count Two alleges that plaintiff was

subjected to severe and pervasive harassment based on his disability since October 2002.

### **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

4

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the

5

legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) failure to reasonably accommodate**

Count One alleges that plaintiff was disabled within the meaning of the ADA and

defendant failed to reasonably accommodate him after March 22, 2004 "at which time

[plaintiff] was put into a production position, which defendant claims required production of

225 parts per hour."  (Compl. ¶ 14).

The Americans with Disabilities Act, 42 U.S.C. §§ 12111 et seq. (ADA), prohibits

covered employers from "discriminat[ing] against a qualified individual with a disability

because of the disability of such individual...." 42 U.S.C. § 12112(a).  Discrimination under

the ADA  includes

> 'not making reasonable accommodations to the known physical or mental limitations
> of an otherwise qualified individual with a disability who is an ... employee....' [42
> U.S.C.] § 12112(b)(5)(A).  To prove a failure-to-accommodate claim under the ADA,
> a plaintiff must show that he has a disability, that he is otherwise qualified for his
> position, and that the defendant refused to make a reasonable accommodation.

*Stefanski v. W.W. Grainger, Inc*., 2005 WL 2572369 (6th Cir. October 12, 2005) (citations

omitted).

Defendant asserts that plaintiff cannot show two elements of his prima facie burden:

1) that he is qualified for the single-point welding position or 2) that defendant failed to

provide the necessary accommodation.

**(a) qualified for the position**

In order to show that he is a qualified individual with a disability, plaintiff must

establish that he "is qualified to perform the job requirements with or without reasonable

6

accommodation." *Cantrell v. Nissan North America Inc*., 145 Fed.Appx. 99, 104 (6th Cir.

2005) (citing *Penny v. United Parcel Service*, 128 F.3d 408, 414 (6th Cir.1997).

Defendant asserts that plaintiff could not meet the target number of pieces per hour, an

essential function of the single-point welding job.  Defendant submits the affidavit of Sophie

King, an industrial engineer at defendant's Walton Hills Stamping Plant.  She avers,

> The pieces per hour target on production machines is not set arbitrarily.  Instead,
> Ford's Industrial Engineers conduct time studies, which assign times to tasks based on
> the body motions used, to determine the maximum number of pieces per hour the
> machine can produce.  An operator is then expected to produce 85% of the maximum
> rate.

(King aff.)  Plaintiff testified that his target was 225 parts per hour.  (pltf. depo. 60)  Plaintiff

further testified that he was unable to meet this target, completing only 75-95 parts per hour.

(*Id.*)  Plaintiff also testified that there was no accommodation which would have allowed him

to do the job of 225 parts per hour.  (*Id.* at 99)

Defendant asserts that it is not obligated to continue plaintiff's employment on the

single-point welding job when he consistently failed to produce more than 35% of his target.

Defendant points out that a reasonable accommodation within the ADA does not require

lowering standards or removing essential functions of the job.  *Taylor v. Phoenixville School

Dist.,* 184 F.3d 296, f.n. 10 (3rd Cir. 1999).  *See also Jasany v. U.S.P.S.,* 755 F.2d 1244, 1250

(6th Cir. 1985) (citations omitted) ("The [defendant] was not required to accommodate

[plaintiff] by eliminating one of the essential functions of his job.  Section 504[1] imposes no

---

[1]     Like the ADA, Section 504 of the Rehabilitation Act of 1973 prohibits
       discrimination based on disability by programs or activities receiving Federal
       financial assistance.  The Sixth Circuit has held that cases construing one statute
       are instructive in construing the other. *Doe v. Woodford County Bd. of Educ.*, 213
       F.3d 921, 925 (6th Cir. 2000) (citing *McPherson v. Michigan High School Athletic*

requirement... to lower or to effect substantial modifications of standards to accommodate a handicapped person.") and *Brickers v. Cleveland Board of Education,* 145 F.3d 846, 850 (6th Cir. 1998) ("The ADA does not demand that an employer exempt a disabled employee from an essential function of the job as an accommodation.")

Initially, plaintiff asserts that this Court's determination of whether he is a qualified individual with a disability is resolved by whether he could perform any job within the 80 Department and not merely the single-point welding job.  However, the law requires plaintiff to demonstrate that "he is qualified to perform the essential functions of *his job* with or without reasonable accommodation."  *Stokes v. Hamilton County, Tenn*., 113 Fed.Appx. 680, 683 (6th Cir. 2004) (emphasis added).

Moreover, plaintiff contends that the 225 parts per hour quota is not an essential function of the single-point welding job.  Defendant argues that it is clear that the quota was an essential function of the single-point welding job.  For the following reasons, this Court agrees.

The Code of Federal Regulations, which implements the ADA, states,

> (n) *Essential functions*– (1) *In general*. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.

29 C.F.R. Pt. 1630, App. § 1630.2(n).  This section enumerates seven non-exclusive factors to be considered in determining whether a function is essential:

_____

*Ass'n, Inc.,* 119 F.3d 453, 460 (6th Cir.1997) ).

8

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(*Id.*)

Plaintiff contends that defendant has not demonstrated that it actually requires all employees to perform the function.  *Ryan v. City of Highland Heights,* 1995 WL 584733 (N.D. Ohio July 19, 1995) ("The initial inquiry in determining whether a job requisite is essential is whether an employer actually requires all employees in the particular position to perform the allegedly essential function.") (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n)). Plaintiff asserts that defendant has failed to provide evidence that other employees are meeting the quota or were reprimanded. However, defendant has produced evidence that other employees were meeting the quota and that failure to meet at least 80% of the quota resulted in discipline.  Chuck Silvey testified that each employee on the 255D line was expected to complete 225 parts per hour and failure to do so, when circumstances outside the employee's control do not exist, could result in discipline.  (Silvey depo. 56-59).  Another supervisor, Nick Gliatta, testified that an employee was not disciplined so long as he produced 80% of the target.  (Gliatta depo. 51).

Nor, plaintiff asserts, do reasons exist for considering the function essential.  Plaintiff

9

posits that the welding position does not exist to perform the 225 parts per hour quota but to produce welded parts.[2]  And, because the position was a single-point job, plaintiff contends that his production did not affect the productivity of other workers.   Contrary to plaintiff's suppositions, defendant points to evidence before the Court that demonstrates otherwise. Silvey testified:

> A. ... [W]e have requirements that we have to meet for our customers.  If the job needs to run, regardless of what my talent pool is at the time, we run the jobs to satisfy our customers.  We have a schedule that we must follow.
>
> Q.  All right.  When you say a schedule, do you mean that there was a level of production you had to meet?
>
> A.  We're required to - - basically the biggest thing is we can't shut our Assembly Plant down.  We have to keep our customers in parts, and they tell us how many parts are required to satisfy the customer for a given week, and we do our best to meet these requirements.

(Silvey depo. 25).  Gliatta testified that parts made on the single-point job were shipped to an Avon Ohio assembly plant, "so they need their parts to assemble vehicles at the assembly line, absolutely."  (Gliatta depo. at 43) When asked whether he had even seen the Avon plant stop production because it ran out of parts, Gliatta responded, "I've never seen it actually stop, but it's been close."  (*Id.*)   Thus, the evidence does show that failure to produce the required number of parts has an impact on defendant's production.

Plaintiff further asserts that defendant did not have a job description for this position and, therefore, does not have objective evidence that 225 parts per hour was an essential

---

[2]     29 C.F.R. Pt. 1630, App. § 1630.2(n)(2) states that a job function may be considered essential where "the reason the position exists is to perform that function."

function of the position. Nor, plaintiff asserts, was this target agreed upon by the Union in the

Collective Bargaining Agreement. Plaintiff points to the deposition testimony of Kevin

Kalinowski, a Union representative, who states that "we don't have targets." (Kalinowski

depo. 11).

Defendant acknowledges that there is no written job description for the single-point

welding job but points to evidence demonstrating an unwritten agreement between the Union

and defendant as to the existence of a quota. Union representative William Smith

acknowledged that defendant had a "target" or "goal" to achieve. (Smith depo. 25) Gliatta

testified that, although not in writing, both defendant and the Union "accepted" that 80% of

the target or rate was sufficient to avoid discipline. (Gliatta depo. 51) Union representative

Kalinowski testified that although he "never admit[s] to a target" and does not "acknowledge

the number," he tells "the guys if they tell you to run 108, you run 108, then wait till the next

hour and you run another 108." In other words, produce the number for that hour, and then

stop. (Kalinowski depo. 29-30).

Finally, plaintiff contends that lowering or eliminating the quota would be a

reasonable ADA accommodation. However, plaintiff does not show that he proposed

lowering the quota as a possible accommodation as he is required to do. *Bingaman v. Procter

& Gamble Co.*,  2005 WL 1579703 (6th Cir.July 6, 2005) (Plaintiff has the duty to propose

an objectively reasonable accommodation.) and *Lorubbio v. Ohio Dept. of Transportation,*

1999 WL 357758 (6th Cir. May 21, 1999) (Plaintiff "bears the initial burden of proposing an

accommodation and showing that [it] is objectively reasonable.") Moreover, as discussed

above, the ADA does not require that employers lower production standards. *See also*

11

*Bingaman, supra* (noting that "job restructuring" may be a reasonable accommodation but only as to non-essential duties or marginal functions of a job).

Plaintiff asserts that *Milton v. Scrivner, Inc.,* 53 F.3d 1118 (10th Cir. 1995), which held that meeting certain employer standards was an essential function of an employee's position, is distinguishable.  In *Milton*, plaintiffs worked as grocery selectors in defendant's grocery warehouse.  Defendant established new production standards which required plaintiffs to accomplish their jobs in a shorter amount of time.  When plaintiffs were unable to meet the pace of the new standards, they were discharged.  The court rejected plaintiffs' assertion that the new production standards were not an essential function of their jobs.  Evidence was presented that the new standards were implemented to improve defendant's competitiveness in the marketplace, and that the changes were aimed at increasing efficiency and productivity and had done so.  The standards were applied to all selectors.

Plaintiff asserts that there is no evidence that the quota involved here was instituted by defendant to better compete in the marketplace or increase profits.  However, as discussed above, defendant has presented evidence demonstrating the importance of meeting the targets in terms of maintaining production to satisfy its customers.

For these reasons, the target or quota of the single-point welding position was an essential function of the job.  Plaintiff admits that there was no accommodation which would have permitted him to meet the target. Plaintiff's inability to satisfy more than 35% of the target makes him unqualified for the position.  Therefore, plaintiff fails to establish a prima facie case under the ADA.

**(b)  failure to reasonably accommodate**

12

Assuming he was a qualified individual with a disability, plaintiff asserts that he was assigned to the 80 Department, and not a single production job and, therefore, defendant violated the ADA by failing to look for other jobs in this department that plaintiff was qualified to perform with or without accommodation.

Defendant, however, asserts that it was not its duty to evaluate each and every position at the Walton Hills plant to accommodate plaintiff, but that plaintiff was required to identify those positions he believed would accommodate his restrictions.  For the following reasons, this Court agrees.

To establish a claim for failure to accommodate, plaintiff must prove that he requested a reasonable accommodation. "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Tubbs v. Formica Corp.*, 107 Fed.Appx. 485, 488 (6th Cir. 2004) (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir.1998) ) and *Smith v. Honda of America Manuf.,* 101 Fed. Appx. 20 (6th Cir. 2004).  Reasonable accommodations include transfers to vacant positions. *Tubbs,* 107 Fed.Appx. at 488.  However, where plaintiff seeks a transfer to another position, it is plaintiff's burden to show that at the time of such request, there were vacant positions whose essential functions plaintiff was qualified to perform, with or without reasonable accommodation.  *Peltier v. United States,* 388 F.3d 984 (6th Cir. 2004).  Finally, "In order to establish a prima facie case of disability discrimination under the statute, [plaintiff] must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified."  *Burns v. Coca-Cola Enterprises, Inc*., 222 F.3d 247, 258 (6th Cir. 2000).

13

Plaintiff alleges in his Complaint that he could perform the essential functions of various production positions, with reasonable accommodation.  (Compl. ¶ 21).  Plaintiff's answers to interrogatories identify the following positions that he believed would accommodate his restrictions: loading door lines, 273 cage nut assembly and 273 rail assembly.  (Doc. 19 Ex. 7).  Plaintiff also testified that he continuously requested the cleaner 2 position.  (pltf. depo. 40).  Plaintiff, however, has not satisfied his burden to show that at the relevant time, there were vacant positions for these jobs.  Additionally, plaintiff testified that as of April 22, 2004 (when he was put on no work available status) and June 1, 2004 (when he retired) none of these positions were available.  (pltf. depo. 121, 134-135).

Despite the fact that plaintiff testified that the cleaner 2 position was not "available," plaintiff now avers, "In January of 2004, I was personally aware that two persons in the number 2 cleaner position, Frank Kepner and Danny Hussar, voluntarily retired and those positions were not filled as of the date on which Dr. Rollins claimed I could do no production work."  (pltf. aff. ¶ 21).  However, defendant presents the testimony of the supervisor of the cleaning department who testified that the cleaning department as a whole was downsized, the number 2 cleaners reduced over the years and if four people retired, "we might get one or two replaced."  (Derek Lowell depo. 15-17).  Thus, the evidence is not clear that positions in the cleaner 2 job were open and available.

Furthermore, assuming positions in the cleaner 2 job were available, plaintiff acknowledged at deposition that the position is not governed strictly by plant seniority, but is designed for employees with restrictions and job preference was given to employees with injuries sustained at work.  Plaintiff's injury was not incurred at work.  Defendant's labor

14

relations representative also testified that employees with injuries sustained at work are placed first and employees with other personal restrictions are placed in order of seniority if positions are open.  Although defendant had the ultimate authority to place an employee in the cleaner 2 position, defendant and the Union talked and agreed as to who they would place there.  (Amy Adams depo. 43, 49, 51) Plaintiff testified that his seniority was "not too high." (pltf. depo. 38).  Given that these procedures governed the filling of the cleaner 2 position, defendant was not obligated to place plaintiff in that position after April 22, 2004 if a position was available.  As defendant points out, "[t]he ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list."  *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996).

Plaintiff also asserts that defendant failed to engage in an interactive process with him once it was on notice that plaintiff required an accommodation. Plaintiff contends that Dr. Rollins arbitrarily decided that plaintiff could not perform any production job.  Nor, plaintiff asserts, did defendant follow its internal procedure for placing an employee on medical leave. For the following reasons, these assertions do not warrant denial of summary judgment.

"Federal regulations suggest that the employee and employer engage in an interactive process to determine whether a reasonable accommodation can be made for an employee's disability."  *Breitfelder v. Leis*, 2005 WL 2470996 (6th Cir. Oct. 7, 2005).  In particular, the regulations state:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). "The regulations explain that the appropriate accommodation, if it exists, is best determined through a flexible, interactive process that involves both the employer and the employee with a disability." *Breitfelder* (citing § 1630.9 and *E.E.O.C. v. United Parcel Serv., Inc.*, 249 F.3d 557, 562 n. 1 (6th Cir.2001) ).

Defendant contends that it did engage in an interactive process.  While this is not entirely clear, it is evident that plaintiff did not satisfy his burden to propose a specific accommodation.

Plaintiff admits that defendant accommodated his restrictions from 1996 until March 22, 2004.  (Compl. ¶¶ 13-14).   At that time, plaintiff was transferred to the single- point welding position which required him to weld 225 parts per hour.  Plaintiff acknowledges that he produced around 75-95 parts per hour and that no accommodation would have enabled him to produce the target.  On April 20, 2004, plaintiff's supervisor disciplined him for not making enough parts and talking on the job.  Labor Relations instructed plaintiff to report to Dr. Rollins on April 22, 2004.  The evidence does not show that Rollins arbitrarily decided that plaintiff could not perform any production job.  Plaintiff told Rollins that he was unable to make the 225 part target and that he could not perform any production job at the 100% level.   Rollins, therefore, determined that plaintiff could not perform any production job at the 100% level and, accordingly, issued plaintiff a restriction of "no production work." Plaintiff was then placed on No Work Available because defendant did not have a job within this restriction.  (pltf. depo. 68; Amy Adams depo. Ex. 3).  Plaintiff has not demonstrated that he requested further reasonable accommodation, as was his burden.  *Lockard v. General Motors Corp.,* 52 Fed. Appx. 782 (6th Cir. 2002) ("While it is possible that an employer may

16

violate the terms of the ADA by failing to engage in such an interactive process in good faith... The burden remains on the employee to request an accommodation.") While plaintiff continuously requested a cleaner 2 job, plaintiff has not demonstrated, as discussed previously, that this position was open.  And, defendant was not obligated to alter its procedures to accommodate plaintiff if this position was vacant. *Burns,* 222 F.3d at 257 ("Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual. As the Seventh Circuit observed ... 'nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers.'")

 Finally, defendant acknowledges that it did not follow its own procedure for placing an employee on medical leave because no work is available in his restriction, but asserts that such action would have been futile.  This appears to be so.  Plaintiff was given a restriction of "no production work."  Defendant states that the Walton Hills plant is a production facility. This appears to be undisputed.  As discussed above, no cleaner positions were available to plaintiff and defendant was not obligated to place plaintiff in such a position if there was a vacancy.  Therefore, plaintiff was properly placed on medical leave because no work was available.

 For the foregoing reasons, plaintiff's failure to accommodate claim under the ADA fails.

 **(2) hostile work environment**

17

Count Two alleges that plaintiff was subjected to severe and pervasive harassment based on his disability since October 2002.

The Sixth Circuit recognizes ADA hostile work environment claims.  The standard for such claims tracks that used for hostile work environment sexual harassment claims. *Coulson v. The Goodyear Tire & Rubber Co.*, 31 Fed.Appx. 851, 858 (6th Cir. 2002).

In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, (1998).  In particular, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23,(1993)).

Accordingly, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment to create an abusive working environment." *Broska v. Henderson,* 70 Fed. App. 262 (6th Cir. June 30, 2003) (citing *Harris,* 510 U.S. at 21). Moreover, the test "has both an objective and subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." *Id.*

Finally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, *supra*.

Defendant argues that the alleged harassment was not severe or pervasive.  This Court

18

agrees.

Plaintiff was questioned at deposition as to harassment by supervisors.  Plaintiff testified that Nick Gliatta and Chuck Silvey harassed him.  As to Gliatta, plaintiff testified that the actions believed to be harassment were, "That I was going to the bathroom too many times."  As to Silvey, plaintiff testified:

> A.  The same thing, threatening me, saying he was going to take me down to the office.
>
> Q.  When you say 'threatening,' what do you mean by that?
>
> A.  He said, if I don't produce more, go to the bathroom less, that he was going to have to do something about it like take me down to Labor Relations, which he finally did.

Further,

> A.  Telling me that - - he would let me go to the bathroom, but when I'd get back, he'd be there waiting for me, telling me I was gone too long, that I'm going too many times.

(pltf. depo. 80-82).  In answers to interrogatories posed by defendant, plaintiff identified two incidents of perceived harassment by supervisors.  (Doc. 19 Ex. 7, no. 12).  These include the following: 1) The 1996 incident about his return to work following surgery wherein his supervisor told him to go to the labor relations office after he went to the bathroom without waiting for a replacement on the line.  On the way to the office, plaintiff encountered a Union representative who then spoke to plaintiff's supervisor.  Plaintiff was then immediately transferred to a single-point job.  2) Supervisor Dallas Holcomb's 1996 comment that

19

plaintiff's job should be moved closer to the toilet. [3]

In response to defendant's motion, plaintiff submits his affidavit which states in

relevant part:

> When I worked production jobs I experienced harassment on a weekly basis, regardless of the fact that my supervisors were aware of my disability and my need to frequently use the bathroom.
>
> I repeatedly talked to a number of people in Ford management about being placed in the number 2 cleaner position as an accommodation to my disability and so I would not be subjected to harassment and embarrassment in the work place.
>
> I applied for retirement because I was concerned about losing my job and as a result of the harassment I was receiving, the refusal of Ford to put me in a number 2 cleaner position.

(pltf. aff. ¶¶ 3, 9, 11).  To the extent that plaintiff now avers that the harassment occurred on a

"weekly basis" this is inconsistent with plaintiff's earlier sworn deposition testimony and

verified answers to interrogatories.  Plaintiff cannot create an issue of fact by presenting such

testimony.  *In re Best*, 109 Fed.Appx. 1, 10 (6th Cir. 2004) (citing *Reid v. Sears, Roebuck*, 790

F.2d 453, 460 (6th Cir.1986) (A party may not create a factual issue by filing an affidavit

which contradicts his earlier deposition testimony.")

Even if plaintiff's averment of "weekly" harassment does not contradict his earlier

testimony, this statement amounts to a conclusory allegation lacking detail which is

insufficient to overcome summary judgment on this issue.  *Wixon v. Dowagiac Nursing*

*Home,* 87 F.3d 164 (6th Cir. 1996).  Plaintiff does not offer a time period, and the Court

---

[3]     Plaintiff also refers to two occasions where unknown employees put coffee cans or buckets in his area.   Plaintiff, however, does not dispute that defendant cannot be held liable for co-worker incidents without its knowledge.

cannot assume that plaintiff is referring to the entire period of 1996 through 2004.  Plaintiff does not identify specific perpetrators or incidents.

Therefore, the Court is left with comments made by Gliatta and Silvey regarding plaintiff's frequent bathroom use.  The evidence presented does not amount to sufficiently severe or pervasive harassment.  In *Coulson, supra,* for example*,* colleagues' alleged name-calling and harassment of plaintiff who suffered major depression and other mental problems, including calling plaintiff "looney tune," "wacko" and "crazy," did not amount to a hostile work environment actionable under the ADA.  Furthermore, defendant points out that courts have recognized that employers have a right to know their employees' ability to work:

> Plaintiff's superiors may have questioned her regularly concerning her work restrictions, the gravamen of the harassment claim, but every employer has a right to know its employees' availability to work. The Court can find no evidence of harassment in those queries even if an interrogator questioned Plaintiff in a less than cordial manner or made skeptical or sarcastic remarks in response to her answers. A plaintiff's over-sensitivity in such matters does not comport with the objectively reasonable standard of harassment applied to hostile work environment claims.

*Gunderson v. Neiman-Marcus Group, Inc*., 982 F.Supp. 1231, 1235 (N.D. Texas 1997).

For these reasons, plaintiff fails to establish a hostile work environment.

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 12/13/05

21